Filed 7/20/22  P. v. Williams CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077337 |
| v. | (Super.Ct.No. INF1900144) |
| JOHN CLEMENT WILLIAMS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Matthew C. Perantoni, Judge.  Affirmed.

Jean Ballantine and Pauline Villanueva, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, and A. Natasha Cortina and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

There is evidence that defendant John Clement Williams sexually molested two of his step-granddaughters.  The molestations consisted of rubbing both children's crotches,

1

touching his penis to a child's underwear, making a child touch his penis, rubbing a child's buttocks, and holding a child down on a bed while kissing her.

At the time, the girls did not disclose the molestation. After the older girl had turned 18 and was living independently, defendant came to her house and banged on the door; when she did not answer, he left a note that she found threatening. At that point, she disclosed the molestation, and as a result, her younger sister did, too.

In a jury trial, defendant was found guilty on six counts of a nonforcible lewd act on a child. (§ 288, subd. (a).) A multiple victims allegation for purposes of the "one-strike" law was found true. (§ 667.61, subd. (e)(4).) Defendant was sentenced to 30 years to life in prison.

Defendant now contends:

(1) Testimony regarding Child Sexual Abuse Accommodation Syndrome (CSAAS) should be inadmissible for any purpose.

(2) Testimony that certain behavior is "usual" or "common" among child victims of sexual abuse is inadmissible.

(3) Statistical evidence regarding the behavior of child victims of sexual abuse is inadmissible.

(4) CALCRIM No. 1191B, which allows a jury to consider evidence of one charged sexual offense as relevant to another charged sexual offense, is erroneous.

(5) The trial court erred by refusing to instruct on simple assault and simple battery as lesser included offenses.

2

We find no error.  Hence, we will affirm.

I

STATEMENT OF FACTS

A.     *The Lewd Acts*.

Sometime in 2007, defendant and his wife Jeannette ("Jeannie") moved into a two-bedroom condominium in Cathedral City.  Jeannie's adult son lived there with them.  In March 2008, they moved to a mobile home in Thousand Palms.

Jeannie had an adult daughter from a previous relationship, named Donna.  Donna's older daughter Mi. was born in 1999, and her younger daughter Ma. was born in 2003.[1]

Sometimes, the girls stayed overnight with defendant and Jeannie.  When they did, Mi., Ma., Jeannie, and defendant all slept together in the same bed.

Mi. testified to two of the charged incidents of molestation.  They both occurred at the Cathedral City condo, and thus when Mi. was between seven and eight.

Once, she was asleep in bed with defendant and Jeannie; around dawn, she awoke to find that defendant was "rubbing the outer layer of [her] vagina."  Something similar happened five or six more times.

_____

[1]     The trial court ordered that the victims be referred to as "[first name] Doe." (See § 293.5.)  Their first names, however, were unusual and distinctive.  We therefore accord them protective nondisclosure by using the first two letters of their first names (see Cal. Style Manual (4th ed. 2000) § 5.9), and we use only first names for their relatives.

Second, at night, in the bedroom, Mi. was watching TV while defendant got ready for work. Defendant pulled down his pants and underwear, pulled down her shorts, and "put his penis on [her] underwear."

She did not tell her parents about the molestation because she thought they would be angry and blame her.

Ma. testified to four of the charged incidents of molestation. The first three occurred in the Cathedral City condo, meaning that she was between three and four.

Once, Ma. and defendant were lying on the bed; he held her hands down and kissed her face and neck. This happened more than once.

Another time, when Jeannie was at work and defendant and Ma. were watching TV in bed, defendant pulled down her underwear, licked his hand, and rubbed her vagina.

Yet another time, defendant and Ma. were lying in bed watching TV; defendant grabbed her hand and put it on his erect penis.

The fourth charged molestation occurred in the Thousand Palms mobile home. Ma. was sleeping in bed between defendant and Jeannie. She was awoken by defendant rubbing her buttocks over her nightclothes.

She did not tell her parents about the molestation because she was scared.

Once, Mi. saw defendant and Ma. in bed; although they were under the covers, he appeared to be touching Ma.'s vagina. When Mi. came in, he moved his hands away.

4

B.     *The Disclosure.*

When Mi. and her boyfriend were in high school, she told him that defendant had sexually touched both her and Ma. She was crying and could hardly talk.[2] She claimed her parents knew.

As of October 16, 2018, Mi. and her boyfriend had recently moved into a house in Palm Springs. It belonged to her father. Defendant had helped her father fix it up.

On that date, Mi. and her boyfriend were watching TV when she saw defendant walk up to the house and knock on the door. Mi. was terrified; she turned pale and started crying and shaking. She did not think he knew where she lived. Defendant kept knocking and banging on the door and said, "I know you're in there." Her boyfriend asked, "Do your parents know?" She admitted they did not. The boyfriend phoned her parents and told them to come over.

After about 20 minutes, defendant put a note on the front door, then left. The note said, "I was in the neighborhood so I thought I would stop by and say hello. I know your home heard stereo shut off when I knocked. Anyways I like your new Jeep and I put a lot of time into this house Im glad to see you here. Next time Im here I will show you a secret compartment in one of the walls here. Take care you know I'll allway lou you its been a pleasure watching you grow up. [¶] Your uncle, step Grandpa [¶] your friend

---

**2**      Mi. was also crying and distraught when she disclosed the molestation to her parents, when she talked to police officers, and when she testified.

[¶] "John W. The comment about the secret compartment "made [Mi.] feel uncomfortable and unsafe."

When her parents arrived, Mi. disclosed that, when she was young, defendant had touched her inappropriately. Afterwards, her mother asked Ma., "[D]id [defendant] do anything to you when you were little?" Ma. said yes and started crying. Their mother contacted the police.

C.   *The Investigation*.

On October 21, 2018, a police officer interviewed Ma. She told him about two of the four incidents to which she later testified. She testified that she remembered the other two immediately after the officer left.

The officer also interviewed Mi. She told him about both times that defendant had molested her. She also said, as she did at trial, that once, she walked into defendant's bedroom and saw him touching Ma.'s vagina.

On November 7, 2018, a forensic interviewer interviewed Ma. This time, she disclosed all four incidents.

On November 20, 2018, in cooperation with the police, Mi. tried to make a pretext call to defendant, but he did not answer. She left him a voicemail saying, "I wanna tell my mom. No one knows and I feel like my own parents should know. And now that I'm older, it's affecting me a lot more." She also texted him and asked when he could talk on the phone.

Defendant texted back, "id rather talk face to face whats up!?" Then he texted, "I just listened to msg. What are you talking about? I'm sorry you feel the way you do but i dont know what your upset about. please talk to me before you talk to anyone else you know how they blow stuff out of poportion whatever it is."

Later on the same day, Mi. made a second pretext call to defendant; this time, he answered. She said, "I wanted to talk to you about something that's been bothering me." "And I wanna tell my parents because it's affecting me a lot now . . . ."

Defendant claimed he did not understand what she was talking about. She then said, "When I was little," "you touched me." He denied it. He said, "You're gonna destroy my life and I haven't done anything . . . ." He added, "I was inappropriate when, like, a couple times, . . . I got naked or I was like . . . let's take showers and stuff like that. But that was it . . . ."

He then accused her of grabbing his hand and putting it down her pants when they were taking a nap together. She denied this: "No, I woke up to you touching me."

At this point, Mi. was so emotional that she was hyperventilating and could not talk. The police officer signaled to her to hang up.

After the call, defendant texted Mi., "I'm shocked you would say something like this. I've been nothing but good to you. I'm sorry you're struggling with this, but telling your folks is not the answer. It will only lead to more unhappiness. Jeannie and I are struggling enough as it is."

At trial, Mi. denied ever grabbing defendant's hand and putting it down her pants.

A police officer tried to contact defendant. At first, he did not respond to the officer's messages, but after the officer asked Jeannie to ask defendant to contact him, defendant agreed to be interviewed.

At the interview, on January 16, 2019, defendant denied ever touching Mi. inappropriately. He said he was "hurt" and "in shock." He added, "[S]he used to sleep with us a lot," but "my wife was always there . . . ."

When the officer asked, "[S]he's sayin' it happened when?," defendant said, "[W]hen she's 7 or 8 or something." In the pretext call, Mi. had not mentioned her age.

When asked if she ever grabbed his hand and put it on her "private area," he said no. The officer then noted that defendant had said in the telephone call that she did. Defendant responded, "[S]he did do that once"; he had denied it "to protect her from further embarrassment."

He added, "[I]f you want me to be honest yes, um, once or twice I was inappropriate . . . ." After swimming in the pool, "the kids" said, "John, come in the shower with us," so he did. They were naked, but he had shorts on. His wife said, "John you shouldn't be in there because . . . if someone sees you it might not look right," so he got out.

The officer then revealed that Ma. was making "similar allegations." Defendant responded that he was "pissed" because he "hardly kn[e]w" Ma.[3]

---

[3] The officer who conducted the interview had advanced training in interrogation techniques. He tried some of these on defendant, including minimizing the

*[footnote continued on next page]*

On January 23, 2019, the police made the decision to arrest defendant. They contacted Jeannie, and she contacted defendant; she told the police he was coming home to meet with them. Thus, the officers waited outside defendant's home.

Defendant was driven home by a friend. As they got close, defendant made eye contact with the officers, then ducked down. He said, "I think the police are after me." The car went past the home. The officers jumped in their cars, followed it, and initiated a traffic stop. Defendant told his friend to keep driving, but the friend pulled over, and defendant was arrested.

As we will discuss in more detail in part II, *post*, Dr. Veronica Thomas, a psychologist, gave expert testimony regarding CSAAS.

D. *Defense Evidence*.

 1. *Defendant's testimony*.

Defendant denied ever molesting any child. He testified that he was alone with Mi. and Ma. only for brief periods, never more than an hour. Although Mi. and Ma. did sleep with him and Jeannie, who slept where in the bed varied.

Once, when defendant and Mi. were in bed watching TV, and Jeannie was in the same bed, asleep, Mi. grabbed defendant's hand and put it on her crotch, over her clothes. He removed his hand immediately and pretended it had not happened. He did not tell Jeannie because he did not want to embarrass Mi.

---

seriousness of the offenses, playing on any feelings for Mi. that defendant might have, and falsely suggesting that the police had DNA evidence, but to no effect.

9

Another time, when Mi. and Ma. had been swimming, they and a third child got into the shower to rinse off. They told defendant he should shower, too, so he got in the shower with them. All three of them were wearing bathing suits. Jeannie told defendant, "You need to get out," so he did.

In October 2018, defendant went to Mi.'s house because he was in the neighborhood, he wanted to say hello, and he wanted to ask if she needed any more work done. Her father had told him that she was living there. He was "[a] little hurt" when she did not open the door. When he referred to a "secret compartment," he meant a window that the house used to have; he had left a Coke can in it before covering it over with drywall.

Defendant believed the girls had been molested by someone, although not by him.

2. *Defendant's wife's testimony*.

Jeannie testified that the girls never came over when she was not home and were never alone with defendant. She never saw him touch the girls or any of her other grandchildren inappropriately.

At the Cathedral City condo, the girls preferred to sleep in bed with her, which sometimes meant with defendant. She and defendant would lie in the middle, with the two girls to either side.

At the Thousand Palms mobile home, Jeannie stopped letting them sleep in her bed; they slept on a futon and a sofa bed.

10

The girls were happy to visit; they never appeared to be afraid of defendant.  They continued to visit until 2017, when Jeannie went back to school.

Once, when defendant was in the shower, the girls "jump[ed]" in the shower with him.  He was not naked, but they were.  Jeannie ordered them out.

E.  *Prosecution Rebuttal Evidence*.

Michell — Jeannie's daughter and the victims' aunt — testified that she stopped by the Cathedral City condo one afternoon, because she felt too sick to drive home after work.  She thought no one was home.  She opened the closed bedroom door and saw defendant on the bed with Mi. and Ma.  He was bare-chested; the rest of his body was under a blanket.  He was between the two girls.  The girls were dressed.

Michell asked what they were doing; defendant said, "We're just napping." "It didn't seem right, so [she] told [her] nieces to come watch TV with [her] in the living room."

When Jeannie got home, Michell expressed her "concern."  Jeannie said she was "making it up" and "making a big deal about it."

II

CONTENTIONS REGARDING CSAAS EVIDENCE

Defendant contends that the trial court erred by admitting Dr.  Thomas's testimony, either because testimony regarding CSAAS is not admissible for any purpose, or because her testimony went beyond the permissible purposes of CSAAS.

11

A.  *Additional Factual and Procedural Background.*

1.  *Motions in limine.*

In its trial brief, the prosecution moved in limine to admit expert testimony regarding CSAAS, with a limiting instruction.

Defense counsel cross-moved to exclude CSAAS evidence.  He argued that it is inherently unreliable when used to prove that sexual abuse actually occurred, and it is unduly prejudicial.

The trial court ruled that the evidence was admissible, subject to a limiting instruction.

2.  *Dr. Thomas's testimony.*

Dr. Thomas was a clinical and forensic psychologist with expertise in child sexual abuse.  She had not reviewed the facts in this case, and she had no opinion as to whether defendant was innocent or guilty.

She testified that child molestation has a "secrecy aspect."  "[Secrecy] has to be established so . . . the abuse can continue.

"[M]ost kids don't tell anybody ever that they were molested."  Even if they do tell someone, that may be after they "keep it a secret for a long time."  One study found that "67 percent may have told somebody within one or more years, and 30 or 25 percent waited more than five years to tell somebody.  So very few people told anybody within the first year . . . ."

The victim may have many reasons not to disclose the molestation. "[Children] may not understand what is happening. They may be told not to tell." The child may feel the molestation is happening because they are bad; they feel guilt and shame. The child may think they will not be believed. Children molested by a family member may worry about the effects on the rest of the family if they were to tell. They may feel "frozen" or "powerless[]." Children are taught about "stranger danger," so they may be confused when abuse is perpetrated by someone they know. They may also be "confus[ed] about loving somebody and caring about somebody who [i]s also molesting them . . . ." They may compartmentalize the abuse, walling it off mentally from the other, more rewarding aspects of their life.

A delayed disclosure may be triggered by something that brings back the memory of the molestation. Disclosure may be "incremental" — "telling a little now, then more or not at all," depending on how it is received.

The prosecutor asked whether victims who make a delayed disclosure are "good historians." Defense counsel objected, "Asking this witness to vouch." The trial court overruled the objection. Dr. Thomas answered, "They are telling what they believe to have happened to them."

Dr. Thomas testified that there are several "myths and misconceptions" about child sexual abuse.

First, it is a misconception that there is a "profile" of a molester. "Anybody can molest a child." "[M]ost of the people that are abusing are known to victims," though

13

"[s]ome are strangers." Defense counsel objected that this was "[p]rofiling evidence. Outside the CSAAS." The trial court overruled the objection. It allowed defense counsel a continuing objection.

Second, it is a misconception that most sexual abuse of children involves force or violence.

Third, it is a misconception that children can do something to protect themselves. This is particularly false when the molester is "somebody that they know and care about, or somebody that they are depend[e]nt upon . . . ."

Fourth, it is a misconception that the child will hate or shun the molester. "Many times they do things to avoid being with that person. But mostly they are people that they like, and they are people that give them things and take them places and generally care about them."

Fifth, it is a misconception that if the child does not take steps to stop the abuse, that means they accept it.

Sixth, it is a misconception that an initial disclosure will include "all the details." "It is a highly emotional experience . . . . It is going to be difficult to remember every single time and every little thing that has been done. And you are a little kid."

Molestation occurs both with and without "other witnesses around."

On cross-examination, Dr. Thomas conceded that people may have memories of something that did not happen. She also agreed that there may be inconsistencies in a

victim's disclosure; these could even include identifying the wrong person as the abuser. She admitted that some people make false accusations of sexual abuse.

Also on cross-examination, Dr. Thomas testified that one Dr. Summit came up with the concept of CSAAS. He found five factors common among children abused in the home but not children abused by strangers: secrecy, helplessness, entrapment and accommodation, delayed disclosure, and recantation. Later, he disapproved of using CSAAS in court "to prove that somebody had been molested[.] [J]ust because there was a secret or . . . helplessness or . . . disclosure [or] recantation[,] [t]hat didn't mean somebody had been abused."

Dr. Thomas herself did not use the term CSAAS — "[i]t is not a syndrome so we try to avoid that phrase." "But there are issues about the concept that are valid and of assistance in regard to sex abuse by somebody that the victim has a relationship with . . . ."

### 3. *Limiting instruction.*

The trial court instructed the jury with CALCRIM No. 1193, as follows: "You have heard testimony from Dr. Thomas regarding child sexual abuse and accommodation syndrome. Dr. Thomas's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not Mi[.] or Ma[.]'s conduct was not inconsistent with the conduct of someone who has been molested. And also, you may consider this evidence in evaluating the believability of the testimony."

B.    *CSAAS Evidence Is Admissible for Appropriate Purposes*.

"CSAAS evidence '"is not admissible to prove that the complaining witness has in fact been sexually abused." [Citation.]' [Citation.] Similarly, an expert providing CSAAS testimony may not give '"general" testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused.' [Citation.]" (*People v. Clotfelter* (2021) 65 Cal.App.5th 30, 64.)

However, "CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse. [Citations.]" (*In re S.C.* (2006) 138 Cal.App.4th 396, 418.) For example, it "'""is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident — e.g., a delay in reporting — is inconsistent with his or her testimony claiming molestation."'" [Citation.]" (*People v. Clotfelter*, *supra*, 65 Cal.App.5th at p. 64.)[4]

---

**4**      Dr. Thomas's testimony was not "CSAAS evidence" *sensu stricto*. She testified that she herself did not use that term, and she did not believe it was appropriate. However, it was CSAAS evidence *sensu lato*; she testified that victims of child sexual abuse are commonly characterized by secrecy, helplessness, entrapment and accommodation, and delayed disclosure (though she did not mention recantation). Moreover, she testified to these matters for the specific purpose of dispelling common "myths and misconceptions" about victims of child sexual abuse.

Defendant agrees that although "on direct examination, Dr. Thomas never referred to 'CSAAS,' it is clear her testimony profiling how child victims and adult abusers act was based on the components of CSAAS . . . ." And the People agree that "the prosecution elicited testimony from Dr. Thomas about some CSAAS characteristics like delayed disclosure . . . ."

16

Defendant concedes this but nevertheless argues that CSAAS evidence should be inadmissible for any purpose, because a jury is so likely to infer that sexual abuse actually occurred that its admission violates due process.

The California Supreme Court has indicated that CSAAS evidence is admissible. In *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), the issue before the court was whether an expert could testify that it is not unusual for a parent to fail to report a known molestation of his or her child. (See *id*. at pp. 1298-1299.) The Supreme Court drew a "direct analogy" to expert testimony regarding CSAAS. (*Id*. at p. 1300.) It noted that the courts of appeal had held that "expert testimony on [CSAAS] is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident — e.g., a delay in reporting — is inconsistent with his or her testimony claiming molestation. [Citations.]" (*Id*. at pp. 1300-1301.) It concluded: "In the case at bar the challenged expert testimony dealt with the failure not of the child victim, but of the child's parent, to report the molestation. Yet the foregoing rules appear equally applicable in this context." (*Id*. at p. 1301.) Admittedly, *McAlpin* itself did not deal directly with the admissibility of evidence regarding CSAAS. Nevertheless, plainly the Supreme Court endorsed the lower appellate court holdings regarding CSAAS.

In reliance on *McAlpin*, California courts have unanimously held that CSAAS evidence does not violate due process — at least, when admitted for a proper purpose and accompanied by a limiting instruction. (*People v. Lapenias* (2021) 67 Cal.App.5th 162,

17

174 [Fourth Dist. Div. Three]; *People v. Munch* (2020) 52 Cal.App.5th 464, 468-472 [Second Dist., Div. Six]; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1747 [Fifth Dist.].)

Defendant cites *Franklin v. Henry* (9th Cir. 1997) 122 F.3d 1270, overruled on other grounds in *Payton v. Woodford* (9th Cir. 2003) 346 F.3d 1204, 1218, fn. 18, which observed that "CSAAS has been examined by several courts in the context of criminal prosecutions and found wanting." (*Id*. at p. 1273.) He neglects to mention that later, the Ninth Circuit held that CSAAS evidence does not violate due process. (*Brodit v. Cambra* (9th Cir. 2003) 350 F.3d 985, 991 [maj. opn.] & 994 [conc. & dis. opn of Berzon, J.], cert. den. sub nom. *Brodit v. Goughnour* (2004) 542 U.S. 925.)

Finally, defendant notes that CSAAS evidence has been held inadmissible in at least three and a half states. (*Blount v. Commonwealth* (Ky. 2013) 392 S.W.3d 393, 395; *Steward v. State* (Ind. 1995) 652 N.E.2d 490, 492-499;[5] *State v. Stribley* (Iowa Ct.App. 1995) 532 N.W.2d 170, 174; see also *State v. J.L.G.* (2018) 234 N.J. 265, 301-304 [inadmissible except to explain delayed disclosure].)[6] Defendant does not tell us how many states, like California, allow CSAAS evidence, at least for some purposes. (See

---

[5]　　In *State v. Velasquez* (Ind. Ct.App. 2011) 944 N.E.2d 34, vacated 963 N.E.2d 1120, reinstated 962 N.E.2d 637, however, a lower Indiana appellate court held that "'[e]xpert testimony that an individual's subsequent behavior is consistent or inconsistent with that observed from other victims . . . is admissible,'" provided the term CSAAS is not used. (*Id*. at p. 42 & 42, fn. 3.)

[6]　　Actually, at least four and a half. (*State v. Bolin* (Tenn. 1996) 922 S.W.2d 870, 873.)

18

*King v. Commonwealth* (Ky. 2015) 472 S.W.3d 523, 535 ["Altogether, forty-one states recognize the admissibility of CSAAS expert testimony for some purpose."] [dis. opn. of Abramson, J.].)  We do not find the decisions of just a handful of states to be persuasive. (See *People v. Munch*, *supra*, 52 Cal.App.5th at pp. 470-472 [declining to follow Kentucky and New Jersey cases].)  Even if we did, stare decisis requires us to follow *McAlpin* and the many California court of appeal cases holding that the admission of CSAAS evidence does not violate due process.

C.     *Evidence That Certain Behavior is "Usual" or Common" Among Child Sexual Abuse Victims Is Not Inadmissible*.

Alternatively, defendant argues that testimony that certain behavior is "usual" or "common" among child victims of sexual abuse necessarily constitutes impermissible "profile" evidence.

This does not logically follow.  For example, if the misconception is that delayed disclosure means that a person claiming abuse is lying, then testimony that delayed disclosure is "usual" or "common" among genuine victims is relevant to dispel that misconception.  Indeed, this is one of the classic uses of CSAAS evidence.  (*People v. Lapenias*, *supra*, 67 Cal.App.5th at p. 172.)  Thus, in *McAlpin*, the Supreme Court said — albeit in dictum — that "expert testimony on the *common* reactions of child molestation victims . . . is admissible to rehabilitate [the complaining] witness's credibility . . . ."  (*McAlpin*, *supra*, 53 Cal.3d at p. 1300, italics added.)  """Even if

19

properly characterized as dictum, statements of the Supreme Court should be considered persuasive."' [Citations.]" (*People v. Reyes* (2020) 56 Cal.App.5th 972, 994.)

Viewing such evidence in isolation, it does present a risk that the jury might misuse it as profile evidence. However, a limiting instruction both focuses the jurors on the proper use of such evidence and forbids them to use it for the improper purpose. "Jurors are presumed to follow the instructions given. [Citation.]" (*People v. Parker* (2022) 13 Cal.5th 1, 71.)

In support of this argument, defendant cites *People v. Wells* (2004) 118 Cal.App.4th 179 (*Wells*). In *Wells*, it was *the defense* that sought to introduce expert testimony that one victim's "calm demeanor was inconsistent with the 'usual' emotional reactions exhibited by trauma victims" (*id*. at p. 189) to show that she had *not* actually been abused. (*Id*. at pp. 187-189.)

The appellate court held that this evidence was properly excluded: "Unlike evidence about CSAAS . . . that is admissible . . . , [the expert]'s proposed testimony about the 'usual' demeanor of trauma victims is not relevant to correct any common myth or misconception about the behavior of children who have been molested. If anything, her proposed expert testimony would likely reinforce a commonly held belief that traumatized victims will become emotionally disturbed or tearful when describing a traumatic event. Because the defense identified no common misperception the jury might hold about victim behavior that [the expert's] testimony was narrowly tailored to rebut,

20

her proposed testimony was little more than expert opinion as to [the victim's] credibility." (*Wells*, *supra*, 118 Cal.App.4th at p. 189.)

Defendant asserts that, like the evidence in *Wells*, "[Dr. Thomas's] testimony was not aimed at correcting or dispelling common misconceptions about abused children . . . ." The jury was instructed, however, that that testimony "is not evidence that the defendant committed any of the crimes charged against him." Assuming for the moment that defendant's assertion is correct, then the evidence was simply irrelevant, and we may presume the jury ignored it.

He specifies as improper Dr. Thomas's testimony that (in his summary): "(1) most actual abuse victims are abused by someone they know . . . and not a stranger; (2) abuse can happen with other people present and is not necessarily violent; (3) delayed disclosure is statistically common and more normal than immediate disclosure; (4) incremental and inconsistent disclosure is common; and (5) children will continue to spend time with the abuser after the abuse."

As the People point out, defendant's argument is illogical. It would be absurd for the jury to conclude that defendant was guilty simply because (1) the girls knew him, (2) other people were present, he was not violent, (3) the girls did not disclose for years, (4) the girls disclosed incrementally, and (5) the girls continued to spend time with him. These factors do not rationally indicate guilt. As the People put it, "To a layperson, these factors seemingly undermine a victim's credibility, not enhance it, which is exactly why expert opinion about CSAAS evidence is admissible and necessary." "[W]hen an

21

expert's methods are based on everyday processes of observation and analysis, we trust jurors to 'rely on their own common sense and good judgment in evaluating the weight of the evidence presented to them.' [Citations.]" (*People v. Lucas* (2014) 60 Cal.4th 153, 224, disapproved on other grounds n *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)

Moreover, Dr. Thomas herself made it clear that her testimony should not be used in a forbidden fashion. She explained, "[J]ust because there was a secret or . . . helplessness or . . . disclosure [or] recantation[,] [t]hat didn't mean somebody had been abused."

Separately and alternatively, the record does not support defendant's assertion that the evidence was not aimed at correcting misconceptions. "'[I]t is the People's burden to identify the myth or misconception the evidence is designed to rebut. . . . [Citation.]' [Citation.]" (*People v. Sandoval* (2008) 164 Cal.App.4th 994, 1002.) But "[i]dentifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation." (*People v. Patino*, *supra*, 26 Cal.App.4th at pp. 1744-1745.) Moreover, the prosecution can introduce CSAAS evidence preemptively; it is not required to wait until the defense puts forward some particular myth or misconception. (See *ibid*.)

Here, each item of testimony that defendant complains about was relevant to dispel some myth or misconception, as follows.

1. *Most molesters are someone the child knows*.

Dr. Thomas testified: "[M]any times I dealt with people who were surprised that it is not a stranger who molests . . . ." This adequately identified a misconception that child molesters are mostly strangers. She also testified:

"[Q.] What does the literature say about . . . the conception that people believe that it is just strangers versus trusted adults?

"A. Well, there is popular conceptions. . . . But the research informs us that most of the people that are abusing are known to victims. Some are strangers."

Thus, this testimony was offered to rebut a specific misconception, rather than as profile evidence. Dr. Thomas even conceded that some children are molested by strangers.

2. *Child sexual abuse can be committed without violence and/or with a third party present*.

When it comes to Dr. Thomas's testimony that child abuse can be committed without violence and with a third party nearby, defense counsel forfeited defendant's contention by failing to object. In ruling on the motions in limine, the trial court merely ruled that CSAAS evidence would be admissible for the usual purpose of rebutting misconceptions about child sexual abuse. If and when the prosecutor offered evidence that exceeded this scope, it was up to defense counsel to object. This particular testimony was introduced before defense counsel objected and, a fortiori, before he was allowed a continuing objection.

23

Separately and alternatively, the testimony was admissible.

Concededly, Dr. Thomas did not testify in so many words that there is a misconception that child sexual abuse is usually accompanied by violence or that it is usually committed far from witnesses. Nevertheless, it stands to reason that such misconceptions are likely. Moreover, if any jurors had these misconceptions, that would have affected their view of the case, as defendant did not use violence, and as Jeannie was sometimes in the bed with defendant and the victim. Thus, it was appropriate for Dr. Thomas to dispel these misconceptions.

Her testimony on these points was not impermissible profiling evidence. She did not testify that child molestation is *never* or *rarely* accompanied by violence; she merely testified "It is not necessarily violent."

Similarly, she did not testify that it *always* or *typically* occurs with someone nearby; rather, she testified:

"Q. . . . [I]s it common to have other witnesses around when the child molestation occurs?

"A. It is not common or uncommon. Every situation is unique, but certainly it happens."

This was appropriately phrased to rebut any misconception to the contrary. The jurors could not possibly have understood it to mean that, just because defendant did not use violence, or just because potential witnesses were nearby, he must be guilty.

3. *Delayed disclosure is more common than immediate disclosure.*

The prosecution expressly offered Dr. Thomas's testimony in part to rebut the misconception that "since the victims did not disclose the molestation immediately, some of the described molests did not occur or are less believable . . . ." Again, this is one of the classic uses of CSAAS evidence. One of the out-of-state cases on which defendant himself relies held that CSAAS evidence is inadmissible *except* to explain delayed disclosure. (*State v. J.L.G.*, *supra*, 234 N.J. at p. 272.)

4. *Incremental disclosure is common.*

The prosecution also expressly offered Dr. Thomas's testimony in part to rebut the misconception that "since the victims gradually disclosed the abuse and did not come out with each and every detail in the initial disclosures, some of the molests did not occur or are exaggerated . . . ." Dr. Thomas testified that it is a misconception that a victim's initial disclosure will include "all the details." This was an appropriate use of CSAAS evidence.

Defendant refers to testimony that "inconsistent disclosure is common . . . ." Dr. Thomas, however, merely testified that "[c]hildren are always going to give answers that are inconsistent . . . unless they are very direct. Direct questions tend to be better for young children." This testimony was simply irrelevant. When the victims disclosed, they were not young children; Mi. was 18 and Ma. was 15. Moreover, there were no particular inconsistencies in their respective accounts. A fortiori, this was not profiling

25

evidence; it would not have affected a reasonable juror's opinion of whether defendant was guilty.

5. *A victim will continue to spend time with the abuser*.

Dr. Thomas identified it as a misconception "that a child who is molested . . . would not go to the alleged perpetrator after the alleged molestation" or would show "dis[d]ain" for the abuser. She testified, "Many times they do things to avoid being with that person. But mostly they are people that they like . . . ." This testimony was tailored to rebut this particular misconception. It was not profiling evidence, as Dr. Thomas conceded that sometimes a child sexual abuse victim *will* avoid the abuser.

We therefore conclude that Dr. Thomas's testimony did not go outside the established bounds for CSAAS evidence.

D. *Statistical Evidence of the Behavior of Child Sexual Abuse Victims Is Not Inadmissible*.

Defendant argues that statistical evidence regarding the behavior of child victims of sexual abuse is necessarily impermissible "profile" evidence.

He relies on three cases. However, all three involved an expert's testimony about the *prevalence of false allegations* of child sexual abuse: (1) that a study had "found false allegations in between 1 and 6 percent of cases" (*People v. Wilson* (2019) 33 Cal.App.5th 559, 568); (2) that the range of false allegations is "'*as low as one percent of cases* to a high of maybe 6, 7, 8 percent of cases" (*People v. Julian* (2019) 34

Cal.App.5th 878, 885); and (3) that "it's rare for kids to make a false claim of sexual abuse" (*People v. Lapenias*, *supra*, 67 Cal.App.5th at p. 177).

Such testimony is not CSAAS evidence; it does not relate to secrecy, helplessness, entrapment and accommodation, delayed disclosure, or recantation. And it is not aimed at dispelling any myth or misconception; it is aimed squarely at guilt or innocence. Thus, these cases do not support a per se rule that statistical evidence about the characteristics of child sexual abuse victims is never admissible.

Here, the only statistical evidence defendant complains about is Dr. Thomas's testimony that "67 percent [of child sexual abuse victims] may have told somebody within one or more years, and 30 or 25 percent waited more than five years to tell somebody." This was aimed at a particular identified misconception — that a genuinely abused child will disclose promptly. It did not invite the jury to conclude that, simply just because Mi. and Ma. did not disclose immediately, defendant was guilty. As discussed (see part II.C, *ante*), that would be illogical, and the jurors would have known it was illogical.

## III

## INSTRUCTION THAT PROOF OF ONE CHARGED SEX OFFENSE

## MAY BE SOME EVIDENCE OF

## THE COMMISSION OF ANOTHER CHARGED SEX OFFENSE

Defendant contends that the trial court erred by instructing the jury with CALCRIM No. 1191B (Evidence of Charged Sex Offense).

A.     *Additional Factual and Procedural Background.*

At the request of the prosecution, and over defense counsel's objection, the trial court gave CALCRIM No. 1191B, as follows:

"The People presented evidence that the defendant committed the crimes of 288(a) as charged in Counts 1 through 6.  If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from the evidence that the defendant was disposed or inclined to commit sexual offenses, and based upon that decision also conclude that the defendant was likely to commit and did commit other sex offenses charged in this case.

"If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of another crime.  The People must still prove each charge beyond a reasonable doubt."

B.     *Discussion.*

Defendant argues that this instruction misstates the effect of Evidence Code section 1108 and unconstitutionally lowers the "beyond a reasonable doubt" burden of proof.  He concedes that, in *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*), our Supreme Court upheld essentially the same instruction.  (*Id*. at pp. 1167-1168.)  He does not claim that *Villatoro* is distinguishable in any way.  He simply asserts that "*Villatoro* was wrong and should be reconsidered . . . ."

28

As defendant recognizes, we have to follow *Villatoro*. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 197 ["'Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court.'"].) Therefore, we reject this contention, although we acknowledge that he has preserved the issue for future review.

IV

FAILURE TO INSTRUCT ON ASSAULT AND BATTERY

AS LESSER INCLUDED OFFENSES

Defendant contends that the trial court erred by refusing to instruct on simple assault and simple battery, as lesser included offenses.

The information alleged each count essentially in the statutory language. However, it also included a capsule description of the particular conduct underlying each count: "[r]ubs vagina with fingers" (count 1); "[r]ubs vagina outside of underwear with penis" (count 2); "[o]n top kissing" (count 3); "[l]icking and touching vagina" (count 4); "[h]and touched penis" (count 5); and "[g]rabbed butt" (count 6).

Defense counsel requested instructions on simple assault (§ 240) and simple battery (§ 242) as lesser included offenses. He argued: "If the jury concluded that the touching was unwelcomed but not done for a sexual purpose, it would be a simple battery or a simple assault." The trial court declined to give the instructions, saying, "[T]he Court does not see any substantial or logical evidence presented as to how any of the conduct could be a simple assault as opposed to [a] 288."

29

A.      *Discussion.*

"A trial court has a sua sponte duty to instruct the jury on any uncharged lesser offense that is necessarily included in a charged offense if there is substantial evidence from which the jury could reasonably conclude that the defendant committed the lesser included offense but not the charged offense.  [Citation.]"  (*People v. Lopez* (2020) 9 Cal.5th 254, 269.)

We considered resolving this issue on the ground that, unlike the lewd act charges, any assault or battery charges were time-barred.  (Compare § 801.1, subd. (a) [limitations period for lewd act runs on victim's 40th birthday] with § 802, subd. (a) [limitations period for misdemeanors is one year]; see *People v. Diedrich* (1982) 31 Cal.3d 263, 283-284 [trial court "need not instruct on a lesser included offense barred by the statute of limitations."].)

The trial court, however, did not base its refusal to give the instructions on statute of limitations grounds.  Moreover, in *People v. Overman* (2005) 126 Cal.App.4th 1344, we held that "the trial court must attempt to elicit a defendant's express waiver of a limitations period defense, when the defendant requests the instruction and it appears that the lesser included offense is, or may be, time-barred."  (*Id*. at p. 1359.)  Thus, if the issue had been raised below, it would have been the trial court's duty to attempt to elicit a waiver.  Absent such an attempt, it would have been error to refuse the instructions. (*Ibid*.)  Thus, we cannot uphold its ruling on this ground.

"'To determine if an offense is lesser and necessarily included in another offense for this purpose, we apply either the elements test or the accusatory pleading test. "Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former."' [Citation.]" (*People v. Lopez*, *supra*, 9 Cal.5th at pp. 269-270.)

The elements of a lewd act are (1) "any touching" of an underage child, plus (2) a sexual intent. (*People v. Lopez* (1998) 19 Cal.4th 282, 289, italics omitted; see § 288, subd. (a); see also CALCRIM No. 1110.) "The touching required . . . may be constructive. [Citation.] That is, 'a defendant need not touch the victim in order to violate section 288.' [Citation.] The required touching may be done by the child on his or her own person provided it was caused or instigated by a perpetrator having the requisite specific intent. [Citations.]" (*People v. Villagran* (2016) 5 Cal.App.5th 880, 890-891.)

The elements of battery are (1) willfully (2) and unlawfully (3) touching the person of another (4) in a harmful or offensive manner. (§ 242; *People v. Marshall* (1997) 15 Cal.4th 1, 38; CALCRIM No. 960.)

The elements of assault are: (1) willfully (2) doing an act (3) that by its nature would directly and probably result in the application of force to a person (4) with the present ability to apply force to a person (5) while aware of facts that would lead a

31

reasonable person to realize that the act by its nature would directly and probably result in the application of force to a person.  (§ 240; *People v. Wyatt* (2012) 55 Cal.4th 694, 702; see also CALCRIM No. 915.)  "The degree of force necessary for a simple assault is identical to that needed for a simple battery."  (*People v. Ausbie* (2004) 123 Cal.App.4th 855, 860, fn. 2, disapproved on other grounds in *People v. Santana* (2013) 56 Cal.4th 999, 1011, fn. 6.)  Thus, the least touching, if it is harmful or offensive, can constitute "force" for purposes of assault.  (*People v. Leal* (2009) 180 Cal.App.4th 782, 791; e.g., *People v. Romero and Self*, *supra*, 62 Cal.4th at p. 48; see also *People v. Colantuono* (1994) 7 Cal.4th 206, 214.)

*People v. Shockley* (2013) 58 Cal.4th 400 (*Shockley*) held that, under the elements test, battery is not a lesser included offense of a lewd act on a child.  (*Id*. at pp. 404-406.)  It explained that the difference is that battery requires a harmful or offensive touching.  (*Id*. at pp. 405-406.)  Thus, if, as the People in *Shockley* were arguing, touching a child with a sexual intent is not harmful or offensive per se, then a lewd act can be committed without also committing a battery.  (See *id*. at p. 405.)

The defendant in *Shockley*, on the other hand, was arguing that touching a child with a sexual intent *is* harmful or offensive per se.  (*Shockley*, *supra*, 58 Cal.4th at p. 405.)  The Supreme Court refused to decide this point.  It explained:  "If we were to agree with defendant, that would mean this form of battery (where lewd conduct supplies the required harmful or offensive touching) is not a *lesser* and *included* offense of lewd conduct but is essentially the *identical* offense.  If guilt of battery is predicated on guilt of

32

lewd conduct — i.e., if a person is guilty of battery *because* that person committed lewd conduct — neither crime would have an element not also required of the other. Substantial evidence could never exist that an element of the lewd conduct offense is missing but that the defendant is guilty of battery as a lesser included offense. [Citation.] A jury could never find the defendant not guilty of lewd conduct (perhaps because of the lack of lewd intent), but guilty of battery, without finding some *other* element of battery not included within lewd conduct. Accordingly, even under defendant's argument, the court would never have to instruct on battery as a lesser included offense of lewd conduct." (*Ibid.*)

Defendant does not invoke the elements test. He argues only that, under the accusatory pleading test, because the information alleged actual physical contact between him and a child rather than a constructive touching, it alleged all of the elements of both battery and assault.

With respect to battery, alleging a physical touching fails to distinguish *Shockley*. *Shockley* did *not* reason that the difference between battery and a lewd act on a child is an actual physical contact between the perpetrator and the child. Moreover, battery, just like a lewd act, can be committed by means of a constructive touching. (*People v. Thomas* (2007) 146 Cal.App.4th 1278, 1293, disapproved on other grounds in *Shockley*, *supra*, 58 Cal.4th at p. 406.) Thus, even though the information here alleged actual physical contact between defendant and a child, that contact either (1) *was not* necessarily harmful or offensive, under the People's theory in *Shockley*, and therefore was not necessarily

33

battery, or (2) *was* necessarily harmful or offensive, under the defendant's theory in *Shockley*, and therefore was identical with battery in all respects.

With respect to assault, *Shockley* is once again controlling. We may assume that, if one touches a child with a sexual intent, one necessarily is also (1) willfully doing an act that by its nature would directly and probably result in touching a person, (2) with the present ability to touch a person, (3) while aware of facts that would lead a reasonable person to realize that the act by its nature would directly and probably result in the touching a person. However, if touching a child with a sexual intent is not harmful or offensive per se, then one may commit a lewd act without necessarily committing assault. And if touching a child with a sexual intent *is* harmful or offensive per se, then committing a lewd act is *always* assault, so no separate instruction is required.

We therefore conclude that the trial court did not err by refusing to instruct on simple assault and simple battery.

V

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER

J.

CODRINGTON

J.

34